*In re* ALZ

Docket No. 230788. Submitted June 6, 2001, at Grand Rapids. Decided
August 31, 2001, at 9:00 A.M.

James S. and Michelle L. Van Dyke, husband and wife, petitioned the
Kent Circuit Court, Family Division, for termination of the parental
rights of Scott P. McHugh in A.L.Z. and for adoption of A.L.Z. by
James Van Dyke. A.L.Z. was born to petitioner Michelle Van Dyke
and fathered by the respondent, as determined in a paternity action
brought by the respondent and concluded two months before the
petition for parental rights termination and stepparent adoption.
The court, Patricia D. Gardner, J., denied the petition. The petition-
ers appealed.

The Court of Appeals *held*:

1. MCL 710.51(6) provides in part that if the parents of a child
are unmarried but the father has acknowledged paternity and if the
parent having legal custody of the child subsequently marries and
that parent's spouse petitions to adopt the child, the court, upon
notice and hearing, may issue an order terminating the rights of the
noncustodial parent if the noncustodial parent, having the ability to
support or assist in supporting the child, has failed or neglected to
provide regular and substantial support for the child or, if a sup-
port order has been entered, has failed to substantially comply with
the order for a period of two years or more before the filing of the
petition and if the noncustodial parent, having the ability to visit,
contact, or communicate with the child, has regularly and substan-
tially failed or neglected to do so for a period of two years or more
before the filing of the petition. What was in dispute was whether
the respondent had the ability to visit, contact, or communicate
with the child and failed to do so for a period of two or more years
before the filing of the petition. In denying the petition, the court
did not err in finding that the respondent lacked the ability to visit,
contact, or communicate with the child during the relevant period
before the petition, given that petitioner Michelle Van Dyke refused
to allow the respondent to have contact with the child and the
respondent needed Michelle Van Dyke's permission for such con-
tact until paternity was established just before the filing of the
petition.

2. The court's findings and conclusions do not constitute a violation of petitioner Michelle Van Dyke's First Amendment right of access to the courts. Petitioner Michelle Van Dyke was not penalized for objecting to the respondent's paternity action. The court did not find that the respondent was unable to contact the child solely because of petitioner Michelle Van Dyke's opposition to the respondent's paternity action. Rather, the court found that the respondent's inability to contact the child resulted from petitioner Michelle Van Dyke's resistance to his visitation or communication before the respondent filed the paternity action.

Affirmed.

ADOPTION — STEPPARENT ADOPTION — TERMINATION OF NONCUSTODIAL PARENT'S PARENTAL RIGHTS.

A custodial parent may not refuse the noncustodial parent contact with their child and later use the absence of such contact in support of a petition for termination of the noncustodial parent's parental rights and the child's adoption by the custodial parent's spouse and the child's stepparent (MCL 710.51[6]).

*Kenneth T. Saukas, P.C.* (by *G. Robert Carpenter*), for the petitioners.

*Donald W. Garthe*, for the respondent.

Before: NEFF, P.J., and DOCTOROFF and WILDER, JJ.

PER CURIAM. Petitioners Michelle L. and James S. Van Dyke appeal as of right from the family court's order denying their petition for stepparent adoption of A.L.Z. (born May 29, 1994) pursuant to MCL 710.51(6). We affirm.

Respondent father Scott P. McHugh and petitioner mother Michelle Van Dyke began dating in February 1993 while they were high school students in Grand Rapids. After learning in October 1993, that petitioner mother was pregnant, the couple planned to marry and raise the child together. Three weeks after their daughter, A.L.Z., was born in May 1994, respondent admitted to petitioner mother that he molested two young neighborhood girls when he was fifteen years

old. On learning this information, petitioner mother ended her relationship with respondent and informed him that she did not want him to have unsupervised visits with A.L.Z. Respondent visited A.L.Z. regularly for the first few months of her life.

In 1994, petitioner mother asked the Department of Social Services not to establish paternity or pursue child support from respondent because she believed he was a danger to A.L.Z. and it would not be in the child's best interests to have contact with respondent. In September 1994, respondent moved away to attend Eastern Michigan University, approximately 2½ hours by automobile from Grand Rapids. Respondent did not regularly visit A.L.Z. while he was at school and his last visit with her was in April 1995. In October 1995, respondent told petitioner mother that he wanted to support A.L.Z.; however, he never contributed to her support. During that same period, petitioner mother told respondent that if he truly cared for A.L.Z., he should "let her have a normal life and find a father."

Respondent had no contact with petitioner mother or A.L.Z. between October 1995 and December 1998, and claimed that he did so because petitioner told him to "leave them alone or stay out of their lives." In a letter dated December 15, 1998, respondent wrote petitioner mother the following:

> This letter has been a long time in coming. I have come to a point in my life that is getting to a degree of certainty. There is no way to say this, than to say it.
>
> I miss my daughter. I realize that I have not been in her life for the past four years, but this has been at your request only. I feel that I have abided by your wishes, but in turn have denied myself and [A.L.Z.] a chance to know her

father. I have always wanted to share in the experience of raising her. You were the one who made the decision not to have me in her life. Now I see and feel that it is time for her to know. She will always be a part of me and I a part of her. I would like her to know me if at all possible.

I hope that this does not come as a big surprise to you. I really would like to talk. I am willing to meet you whenever, wherever you wish.

*          *          *

I am hoping that we can somehow settle this in a cooperative fashion. Make certain you understand, I am not doing this to upset anyone. I just feel that I should be a part of our daughter's life. I will be looking forward to your reply.[1]

On January 25, 1999, petitioner mother sent the following letter to respondent:

I was quite surprised to receive your letter.

I'm glad to hear that you've reached a point of certainty in your life. However, I do not feel that by disrupting [A.L.Z.'s] life right now by introducing you to her would be of any benefit to her. This is not about what is best for you or what is best for me, it is about what is best for [A.L.Z.] For the past four and a half years, I have had to put her needs in front of my own, and I would hope you would do the same. She is a very well adjusted child and I do not see any sense in putting her through the confusion of trying to explain to her your past and why you've decided now to be a part of her life.

When she is an adult and more capable of understanding the issues surrounding our situation would be a more appropriate time for you to establish a relationship with her. Until then, I would ask that if you truly care for her, you would not pursue this issue for the sake of her future.

---

[1] Respondent provided an address and telephone number where petitioner mother could contact him, which is omitted from this quotation.

On February 5, 1999, respondent filed a complaint seeking an order of filiation and parenting time in the family court. In the complaint, respondent requested an order declaring him to be A.L.Z.'s father and establishing reasonable parenting time. Petitioner mother opposed respondent's request for parenting time; however, she admitted that respondent was A.L.Z.'s father. On March 24, 2000, the family court entered an order establishing respondent's paternity.

On May 26, 2000, petitioner mother and her new husband, petitioner James Van Dyke, petitioned the family court to terminate respondent's parental rights and allow petitioner stepfather to adopt A.L.Z.[2] The petition claimed that respondent failed to support or contact A.L.Z. for a period of two years or more. At an October 12, 2000, hearing on the petition, petitioner mother claimed she never prevented the father from contacting A.L.Z. or told him that he could not see her. However, she admitted that she did not want respondent to have contact with the child and told respondent that if he cared about A.L.Z. he would not attempt to see her and would leave her be. Petitioner mother also stated that she believed it would not be in A.L.Z.'s best interests to have contact with respondent until she was at least sixteen years old.

The parties did not dispute that respondent had the ability to contribute to A.L.Z.'s support in the two years before the petition was filed but failed to do

---

[2] Petitioner mother and James Van Dyke were married on April 3, 2000, approximately four months ahead of schedule. The wedding date was moved forward after respondent father sought an order for parenting time. Petitioner mother admitted that she moved up the wedding date hoping that her new husband could adopt A.L.Z. and prevent respondent from having contact with her.

so.[3] Respondent also admitted that the only attempt he made to contact A.L.Z. during the two years before the filing of this petition was his December 1998 letter to petitioner mother. Respondent further admitted that petitioner mother did not physically stop him from visiting A.L.Z. and that he had the ability to contact her by letter or telephone; however, he did not believe it would be appropriate to "just show up and surprise her like that," and thought it would make petitioner happier if he stayed out of their lives. In addition, respondent stated that he wanted to "get [his] life together" before he attempted to see A.L.Z. again.[4]

At the conclusion of the October 2000 hearing, the family court entered the following findings of fact and conclusions on the record:

First of all, I would like to compliment Mrs. Van Dyke and Mr. McHugh on the testimony that was provided before the Court today.

\* \* \*

The responses of Mrs. Van Dyke and of Mr. McHugh were brutally honest in response to some very difficult questioning. It is not always the experience of the Court to have such direct, honest, thoughtful, from the heart answers about this very loved little girl and so, although I'm sure this morning was difficult for each of you, I want to thank

---

[3] At the October 2000 hearing, respondent indicated that he had been attending college "on and off for the last six years," had been employed at various restaurants, and was currently employed as a restaurant manager. Respondent father also admitted that, even though he was employed, he sent no money for A.L.Z.'s support, nor did he send her any presents after April 1995.

[4] Respondent stated that in the period during which he had no contact with A.L.Z., he nearly failed in college, was going through depression, and was not financially stable.

you for your honest, thorough and thoughtful responses to the questions.

It is clear to me that [A.L.Z.] has an excellent mother who loves her, wants to protect her and make the right decisions on her behalf. Mr. McHugh's testimony with regard to a daughter that he does not know, also seems to be heartfelt as well.

The Court first must consider whether the non-custodial parent has failed to support [A.L.Z.], having the ability to support the child for two years or more before the filing of the petition. The testimony on this issue is clear and uncontested. Mr. McHugh has had the ability to support or assist in supporting [A.L.Z.] and he has not. He has had the ability to send cash, to send weekly checks and he has failed to do so.

*     *     *

The more difficult issue is whether the non-custodial parent has the ability to visit, contact or communicate with [A.L.Z.] and has regularly or substantially failed for two years before the filing of the petition, which would be the period from May of 1998 through May of 2000. The Court has considered the testimony that Mr. McHugh sent to Mrs. Van Dyke, a letter dated . . . December of 1998. The December 1998 letter, which has been received into evidence as Exhibit #1, clearly asks for contact with the child. Also the January 1999 response very clearly, sets forth the position of the mother, as she's testified in Court today. She requests that Scott not have contact with [A.L.Z.] because she does not believe it to be in her best interests. A paternity action was commenced in January or February of 1999 following the rejection response from Mrs. Van Dyke.

In that complaint, Mr. McHugh asks for contact with the child. In the response to the paternity action, again, the mother's response is clearly set forth, that she doesn't believe it to be in [A.L.Z.'s] best interests, given her age, and the father's lapse of contact.

It is the Court's position that the mother cannot refuse contact and then rely on the lack of contact to meet the statutory basis. The father, frankly, has not been a very

good dad. He has made horrible decisions pertaining to [A.L.Z.] He has been selfish, immature, and irresponsible, but, at some point, he did attempt to change his relationship with [A.L.Z.] His attempts to reintroduce himself to [A.L.Z.] were done with her best interests in mind. He was able to articulate that he shouldn't call [A.L.Z.] and say, "Hey [A.L.Z.], I'm your dad." . . . He may have been able to physically go to her home, but that wouldn't be in anyone's best interests. He did what was the logical thing, given the age of this child and the complete abandonment that had occurred. He believed that he needed to work it out with the mother. Since he wasn't able to work it out with the mother, he needed to work it out through the Courts, to have a determination made regarding visitation.

I find that the paternity action has been an ongoing request for contact since it was filed over a year ago. I find that the mother's position refusing contact any any [sic] reintegration plan, resulted in his inability to have contact with the child. The mother even went to the extreme of moving up her wedding in order to immediately file this step-parent adoption petition.

Therefore, the Court finds that this petition must be respectfully denied because it is premature. Once the issues of parenting time are established, if the father fails, as he has in the past, to put this child first, the petition may be re-filed. At this juncture, the Court finds that the petition is premature and is respectfully denied.

The court entered an order on October 12, 2000, denying the petition for stepparent adoption. It is that order from which petitioners appeal.

Petitioners first argue that the trial court erred in concluding that respondent was unable to contact, visit, or communicate with A.L.Z. during the two-year period before the filing of their petition for stepparent adoption. We review the lower court's findings of fact under the "clearly erroneous" standard. *In re Hill*, 221 Mich App 683, 691-692; 562 NW2d 254 (1997). A find-

ing is clearly erroneous if, although there is evidence to support it, we are left with a definite and firm conviction that a mistake was made. *Id.* at 692.

The procedure and standard for determining whether to terminate the parental rights of a noncustodial parent and allow adoption by a stepparent are governed by MCL 710.51, which provides in pertinent part:

> (6) If the parents of a child are divorced, or if the parents are unmarried but the father has acknowledged paternity or is a putative father who meets the conditions in section 39(2) of this chapter, and if the parent having legal custody of the child subsequently marries and that parent's spouse petitions to adopt the child, the court upon notice and hearing may issue an order terminating the rights of the other parent if both of the following occur:
>
> (a) The other parent, having the ability to support, or assist in supporting, the child, has failed or neglected to provide regular and substantial support for the child or if a support order has been entered, has failed to substantially comply with the order, for a period of 2 years or more before the filing of the petition.
>
> (b) The other parent, having the ability to visit, contact, or communicate with the child, has regularly and substantially failed or neglected to do so for a period of 2 years or more before the filing of the petition.

The petitioner has the burden to prove by clear and convincing evidence that termination of the noncustodial parent's rights is warranted. *Hill, supra* at 691. In order to terminate parental rights under the statute, the court must determine that the requirements of subsections a and b are both satisfied. *Id.* at 692. The court's authority to terminate parental rights under the statute is permissive rather than mandatory. *In re Newton,* 238 Mich App 486, 493-494; 606

NW2d 34 (1999). "[E]ven if the petitioner proves the enumerated circumstances that allow for termination, a court need not grant termination if it finds that it would not be in the best interests of the child." *Id.* at 494.

It is undisputed that the requirements of subsection a were proved, i.e., that respondent had the ability to provide support for the child but failed to do so. The dispute in this case is whether petitioners succeeded in proving by clear and convincing evidence that respondent had "the ability to visit, contact, or communicate with" A.L.Z. and "regularly and substantially failed or neglected to do so for a period of 2 years or more before the filing of the petition." MCL 710.51(6)(b). The family court concluded that respondent did not have the ability to visit, contact, or communicate with A.L.Z. because of petitioner mother's refusal to allow respondent to establish contact with the child. Upon review of the record, we find no error in the lower court's conclusion on this issue.

Petitioners initiated this action to terminate respondent's parental rights on May 26, 2000. Therefore, the applicable period for determining whether respondent's conduct met the conditions specified in the statute would commence on May 26, 2000, and extend back for two or more years before that date, to at least May 26, 1998. MCL 710.51(6)(b); *In re Halbert*, 217 Mich App 607, 612; 552 NW2d 528 (1996). In December 1998, well within that period, respondent wrote petitioner mother and requested visitation with A.L.Z. In her written response, petitioner mother did not forbid respondent from having contact with the child, but asked that he refrain from doing so. At this point, respondent could have made an attempt,

against petitioner mother's will, to contact or visit the child. However, respondent's paternity of A.L.Z. had not been established at that time and, because he was effectively a nonparent, he had no legal right to visitation or communication with the child. See *Girard v Wagenmaker*, 437 Mich 231, 251; 470 NW2d 372 (1991); *Ruppel v Lesner*, 421 Mich 559, 565-566; 364 NW2d 665 (1984). Respondent's proper response to petitioner mother's resistance to his attempts to visit or contact the child was to file a complaint seeking an order of filiation, which he did on February 5, 1999, well within the two-year statutory period under MCL 710.51(6)(b). The family court determined that respondent's December 1998 letter and February 1999 complaint constituted ongoing requests for contact with A.L.Z., but that petitioner mother's resistance to these requests resulted in respondent's inability to contact the child, and we find no error in these determinations.

Petitioners cite a few cases that purportedly support their claim that respondent had the ability to visit, contact, or communicate with A.L.Z. In the first case, *In re Simon*, 171 Mich App 443; 431 NW2d 71 (1988), the father engaged in no communication with his daughter during the statutory two-year period before the filing of the stepparent adoption petition. The father claimed that he did not communicate with his daughter because of a provision in a divorce decree barring any contact with his daughter. Visitation was denied to the father in the divorce decree "until such time as he showed cause why visitation would be in the child's best interest." *Id.* at 445. We found that termination of the father's parental rights was proper because even though the "divorce decree

prohibited visitation, we also are cognizant of the fact that respondent never requested visitation privileges." *Id.* at 449. However, *Simon* is distinguishable from the instant case because, here, respondent tried to visit and contact A.L.Z. but was prevented from doing so by petitioner mother, whereas the custodial parent in *Simon* did not prohibit the father from contacting his daughter.

Petitioners also rely on *In re Martyn*, 161 Mich App 474; 411 NW2d 743 (1987), where this Court held that a parent who makes only two visits and one telephone call to his child in two years has "substantially failed" to visit, contact, or communicate with the child despite the ability to do so within the meaning of the statute. *Id.* at 482. Again, this case is distinguishable from the instant case because the father in *Martyn* had a legal right to visit his child and was not prevented from visiting or contacting the child by the custodial parent. Petitioners' reliance on *In re Caldwell*, 228 Mich App 116; 576 NW2d 724 (1998), is also misplaced. In *Caldwell*, we affirmed termination of an incarcerated father's parental rights because, although he was prevented from physically visiting with his child, he failed to contact or otherwise communicate with the child. *Id.* at 121-122. However, before his incarceration, the father in *Caldwell* was married to the child's mother, and there was no question that he had the right to communicate with the child. This is clearly distinguishable from the present case where respondent had no legal right to contact A.L.Z. before he initiated the paternity action.

Therefore, in consideration of all the evidence presented in this case, we hold that the family court did not err in concluding that petitioners failed to

prove by clear and convincing evidence that respondent had the ability to visit, contact, or communicate with the child during the statutory two-year period.

Petitioners also argue that the family court's findings violated petitioner mother's constitutional right to access the courts because it penalized her for objecting to respondent's paternity action. The United States Supreme Court found a constitutional basis for the right of access to the courts as an aspect of the First Amendment right of petition. *California Motor Transport Co v Trucking Unlimited*, 404 US 508, 510; 92 S Ct 609; 30 L Ed 2d 642 (1972). The right of access to the courts is a facilitative right " 'designed to ensure that a citizen has the opportunity to exercise his or her legal rights to present a cognizable claim to the appropriate court and, if that claim is meritorious, to have the court make a determination to that effect and order the appropriate relief.' " *Foster v City of Lake Jackson*, 28 F3d 425, 430 (CA 5, 1994), quoting *Crowder v Sinyard*, 884 F2d 804, 814 (CA 5, 1989). The right of access to the courts is implicated where the ability to file suit is delayed or blocked altogether. *Foster, supra* at 430.

Petitioners' argument on this issue displays a fundamental misinterpretation of the family court's findings and conclusions. Had the family court in this case found that respondent was unable to contact A.L.Z. solely because of petitioner mother's opposition to respondent's paternity action, then there might be some merit to petitioners' argument. However, it is clear from the court's language on the record that it concluded that respondent's inability to contact his child resulted from petitioner mother's resistance to his visitation or communication *before* respondent

filed the paternity action. Any determination by the family court that petitioner mother's contest of the paternity action resulted in respondent's inability to contact the child would be harmless error where the court correctly concluded that petitioner mother prevented respondent from visiting the child before any legal action was instituted. Therefore, we do not agree that the family court's findings and conclusions in this matter constitute a violation of petitioner mother's right of access to the courts.

In conclusion, we express our agreement with the family court that petitioner mother should not be allowed to refuse respondent contact with A.L.Z., then use his lack of contact against him to support her petition for stepparent adoption. The primary purpose of MCL 710.51 is to "foster stepparent adoptions in families where the natural parent had regularly and substantially failed to *support or communicate* and visit with the child," yet refuses or is unavailable to consent to the adoption. *Newton, supra* at 492 (emphasis in *Newton*). To allow termination of the parental rights of a noncustodial parent who has attempted, although somewhat late in the game, to involve himself with the child and has been consistently rebuffed by the custodial parent would not be consistent with this purpose.

Affirmed.