*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re REV, Minor.

UNPUBLISHED
October 20, 2022

No. 360817
Osceola Circuit Court
Family Division
LC No. 2021-000020-AD

Before: MARKEY, P.J., and SAWYER and BOONSTRA, JJ.

PER CURIAM.

Respondent-father appeals by right the trial court's order terminating his parental rights to the minor child, REV, under the Michigan Adoption Code (MAC), MCL 710.21 *et seq.* REV was born out of wedlock, and her mother released her parental rights to the child and consented to an adoption through interested-party Bethany Christian Services (Bethany), a licensed Michigan adoption agency. Mother petitioned the trial court for a hearing to identify respondent as REV's father and to determine or terminate his parental rights. Respondent refused to voluntarily relinquish his parental rights to REV and sought custody of the child. After numerous proceedings, including a hearing on remand from this Court, respondent's parental rights were ultimately terminated. In light of errors by the trial court with respect to evidentiary standards, we are compelled to reverse and remand for further proceedings.

## I. STATUTORY FRAMEWORK

To provide context to and a better understanding of the factual and procedural history of the case, we begin with an overview of the relevant statutory framework. In general, under the MAC, "if a child is born out of wedlock and the release or consent of the biological father cannot be obtained, the child shall not be placed for adoption until the parental rights of the father are terminated by the court as provided in section 37 or 39 of this chapter[.]" MCL 710.31(1). MCL 710.36(1) provides:

(1) If a child is claimed to be born out of wedlock and the mother executes or proposes to execute a release or consent relinquishing her rights to the child . . ., and the release or consent of the natural father cannot be obtained, the judge shall

-1-

hold a hearing as soon as practical to determine whether the child was born out of wedlock, to determine the identity of the father, and to determine or terminate the rights of the father as provided in this section and sections 37 and 39 of this chapter.[1]

The relevant termination statute in this case is MCL 710.39. But before reviewing MCL 710.39, we take a moment to examine the rules regarding the service of a petition that gives notice to a putative father of a mother's action or plan under the MAC. "Notice of a petition to identify a putative father and to determine or terminate his rights . . . must be served on the individual or the individual's attorney in the manner provided in . . . MCR 2.107(C)(1) or (2), or . . . MCR 2.105(A)(2) . . . ." MCR 3.802(A)(2). MCR 2.107(C)(1) concerns service on an attorney, which is not relevant under the circumstances presented in this case. MCR 2.107(C)(2) provides:

> (2) Delivery of a copy to a party within this rule means
>
> (a) handing it to the party personally, serving it electronically under MCR 1.109(G)(6)(a), or, if agreed to by the parties, e-mailing it to the party as allowed under MCR 2.107(C)(4); or
>
> (b) leaving it at the party's usual residence with some person of suitable age and discretion residing there.

MCR 2.105(A)(2) states that "[p]rocess may be served on a resident or nonresident individual by . . . sending a summons and a copy of the complaint by registered or certified mail, return receipt requested, and delivery restricted to the addressee. . . . ." And "[s]ervice is made when the defendant acknowledges receipt of the mail." *Id.*

With respect to MCL 710.39, we begin with subsection (2) of the statute, which provides as follows:

> If the putative father has established a custodial relationship with the child or has provided substantial and regular support or care in accordance with the putative father's ability to provide support or care for the mother during pregnancy or for either mother or child after the child's birth during the 90 days before notice of the hearing was served upon him, the rights of the putative father shall not be terminated . . . .

When subsection (2) is not implicated and termination is not precluded outright under that statutory provision, and if the putative father requests custody of the child at the hearing on a petition, the trial court, under subsection (1), "shall inquire into his fitness and his ability to properly care for

---

[1] The trial court is required to receive evidence regarding the identity of the father of the child and, "[b]ased upon the evidence received, the court shall enter a finding identifying the father or declaring that the identity of the father cannot be determined." MCL 710.36(6).

the child and shall determine whether the best interests of the child will be served by granting custody to him." MCL 710.39(1). And "[i]f the court finds that it would not be in the best interests of the child to grant custody to the putative father, the court shall terminate his rights to the child." *Id.* The factors to consider, evaluate, and determine when assessing the "best interests of the child" under the MAC are listed in MCL 710.22(g).

## II. BACKGROUND

REV was born on December 4, 2021, at Munson Hospital. Her mother immediately requested that REV be discharged from Munson for direct placement by Bethany with an approved adoptive family. Physical custody of REV was transferred to prospective adoptive parents on the day of birth. On December 4, 2021, mother executed a petition for a hearing to identify REV's father and to determine or terminate his parental rights. In the petition, mother identified respondent as the putative father of REV. On December 10, 2021, a notice of hearing to identify father and determine or terminate his rights was filed. The notice was directed at respondent in care of the Grand Traverse Correctional Facility (jail), where respondent was incarcerated. The notice indicated that the hearing was set for January 5, 2022. The notice further reflected that mother was planning to release her parental rights to the child. The notice warned respondent that a failure to appear would constitute a denial of interest in the custody of the child and result in the termination of respondent's parental rights. See MCL 710.37(1)(d) (the court may terminate the rights of a putative father when the "father is given proper notice of hearing . . . but either fails to appear at the hearing or appears and denies his interest in custody of the child"). The proof of service with respect to the notice of hearing revealed that it was served on respondent by *ordinary* mail to the jail on December 10, 2021. We also note that the proof of service did not indicate that the underlying petition was served on respondent.

On January 5, 2022, the hearing on the petition was held. Both respondent and mother were in jail at the time, and ZOOM videoconferencing was utilized to conduct the hearing. A Bethany representative was present for the hearing. Mother was 100% certain that respondent was REV's father. The first half of the hearing was devoted to reviewing mother's parental rights, obtaining a knowing, voluntary, and understanding waiver of those rights, procuring a valid release of mother's parental rights, and securing her consent to REV's direct placement and adoption. The trial court then turned its attention to respondent. The trial court asked respondent whether he was prepared to release his parental rights to REV and to consent to the adoption. Respondent indicated that he was unsure about what he wanted because he had not had time to consider the matter. He also stated that he would like a paternity test because he questioned whether he was REV's father. Respondent asserted that if REV was his child, he might "like to . . . keep the kid."

The trial court asked respondent whether he had the ability to care for the child. Respondent replied that although he was currently incarcerated on a pending felony charge of domestic violence, third-offense, and could not make bond, he was "hoping to get out soon" and had stimulus and unemployment monies coming to him. He also contended that he was "hoping to buy some land and a trailer." The trial court queried respondent whether he had provided support or care for mother during her pregnancy. Respondent stated that he had never been given a chance to do so because mother had disappeared on him, and respondent reiterated that he did not know whether he was the father because mother had been with other men during the relevant time period. When asked by the court when he learned of the child's birth, respondent replied,

"Just now." Upon questioning by the trial court, respondent indicated that he had not been provided any documentation regarding the hearing and that he was simply brought to a room in the jail and the hearing started.

The trial court next allowed the Bethany representative to question respondent, and respondent acknowledged that he had at some point before REV's birth received a letter from Bethany about the possibility of him agreeing to an adoption of the child. The Bethany representative then spent some time attempting to convince respondent to release his parental rights and consent to an adoption, suggesting that respondent could potentially still have communications with REV and receive pictures of the child after adoption. Respondent again voiced concerns about his paternity and expressed unsureness on how to proceed.

The court then retook the helm on examining respondent, and respondent asked the court whether he could "get an attorney for this or something." The trial court responded that it would have "to order that," and then the court dropped the issue entirely, indicating that it wished to ask respondent some more questions. The trial court peppered respondent with questions about whether there might be any Native-American heritage and tribal membership in respondent's family. Respondent replied that his grandparents might have been Native Americans or eligible for tribal membership, but he was uncertain on the matter. The trial court then ruled:

> I'm going to find on the record that it would not be in the child's best interest to grant custody to you. At this time, you are unable to care for the child. You are incarcerated and it would not be - - the child would not be served well by placing the child with you because obviously the child can't go to you in jail. You've provided me no other information to believe it would be in your best interests to grant custody to you.

The trial court, however, took the matter under advisement, but only for purposes of further exploration of whether REV might be an Indian child, which would trigger state and federal laws and necessitate additional procedures. The court did comment just before going off the record, "I do find father was timely served all the notices that he needed to be served."[2]

On January 7, 2022, a follow-up hearing on the petition was scheduled for February 2, 2022. A proof of service reflected that respondent was personally served on January 7, 2022, with the petition and the new notice of hearing. On January 27, 2022, the trial court entered an order for adjournment, moving the hearing to February 16, 2022. A proof of service showed that the adjournment order with the new hearing date was served on respondent on January 27, 2022, by ordinary mail and by e-mail in care of jail personnel with instructions to serve respondent. Additionally, a separate proof of service indicated that respondent was personally served the order for adjournment on February 15, 2022. A continued hearing by ZOOM videoconferencing was held on February 16, 2022. Respondent did not appear via ZOOM or otherwise at the February 16, 2022 hearing. At the hearing, the trial court first noted that the relevant entities and authorities

---

[2] We note that although respondent spoke at the hearing and answered questions, he was not sworn in as a witness. Mother, on the other hand, testified under oath.

had been given notice relative to any Native-American heritage and that no intervention was sought. The trial court next made the following observations and findings:

> [A]t the last hearing, [respondent] was not willing to consent. He wanted to know whether the child was his. He wanted a DNA test and otherwise. He admitted that he hasn't provided any care for the child. . . . All he managed to say at the last hearing was he wanted a DNA test.

> So as far as today's hearing goes, I do find that the petition to determine the identity of the father and to determine or terminate his parental rights was filed with the court. Notice was given. . . . . .

> [Respondent] . . . did not request custody of the child.[3] But he also had not established a custodial relationship with the child, did not provide any support or care for the mother during her pregnancy or for either the mother or the child after the child's birth. Arguably because he didn't know of the possibility of it being his child but regardless, he didn't provide any of that. He was appearing from jail. He didn't have the ability to provide custody for the child at this time. So I do not believe . . . the father . . . has proper fitness or ability to care for the child. I think he also suggested or seemed to allege if not straight out say that he didn't think he was the child's father. Mother said he was. It would not be in the best interest to grant custody to the putative father in this case.

> So I'm going to order that the parental rights of [respondent] be terminated. . . . I will go ahead and sign the order terminating rights of father without release or consent.

The record reflected that a person, apparently court personnel, chimed in that respondent had been served with the notice of hearing, that she had spoken with the jail, and that she believed that jail officials had planned on making respondent available for the hearing. The trial court retorted:

> If he wished to intercede, he has the ability to do so apparently. Unless we - - I mean, candidly, his interaction today would be unnecessary as he had the opportunity at the last hearing to be heard. He's offered nothing new in writing nor has he asked to proceed, participate. If he would've been made available, I certainly would've allowed him to speak. But I don't think that that changes anything in the [c]ourt's eyes at this point in time.

An order terminating respondent's parental rights without release or consent was entered on the date of the hearing, February 16, 2022. The form order indicated that the trial court found

---

[3] The court appeared to misspeak or there was a scrivener's error, as respondent had indeed noted at the previous hearing his desire to have custody of the child.

that respondent was REV's father, that respondent had been given proper notice of the hearing on the petition, that respondent had requested custody of the child, and that

> [t]he father has not established any custodial relationship with the child or did not provide any support or care for the mother during pregnancy or for either the mother or child after the child's birth. The court inquired into the fitness and the ability of the father to properly care for the child. It would not be in the best interest of the child to grant custody to the father.

On February 16, 2022, the court also entered an order terminating mother's parental rights after release or consent, along with an order making REV a ward of the court for purposes of adoption and placement with the prospective adoptive parents.

The trial court denied respondent's handwritten motion for rehearing in which respondent alleged a failure to provide him an opportunity to be heard at the February 16, 2022 hearing and other errors. The court determined that respondent failed to serve all interested parties with the motion for rehearing, that respondent had not asked the court to have the jail make him available for the hearing, that court staff had alerted the jail of the hearing, that the court had no independent knowledge why respondent failed to appear at the hearing, and that, regardless, his appearance would have made no difference because the court had already made its ruling at the earlier hearing on January 5, 2022. Accordingly, the motion for rehearing was denied.

Respondent filed a claim of appeal in this Court on March 28, 2022. On April 19, 2022, respondent filed his brief on appeal. Respondent argued that his constitutional rights were violated because he had not been properly served with the petition to identify REV's father and to determine or terminate his parental rights, as well as the associated notices of hearing. Respondent additionally contended that the trial court erred by finding that the evidence was sufficient to support the termination of his parental rights. On May 4, 2022, Bethany, as an interested party, see MCL 710.24a(1)(d) and (2)(a), filed a motion to remand. Bethany essentially concluded that there was some merit to respondent's arguments about notice deficiencies and the adequacy of the court's findings. Bethany requested remand so that the trial court could properly hear from respondent and develop the record. Bethany filed an accompanying motion for immediate consideration. On May 13, 2022, respondent filed a motion to amend his brief on appeal to provide some clarity regarding his prayer for relief in light of Bethany's remand motion. He also filed a motion for immediate consideration. On May 23, 2022, this Court granted Bethany's motions for immediate consideration and remand. *In re REV Minor*, unpublished order of the Court of Appeals, entered May 23, 2022 (Docket No. 360817). The motion panel remanded the case to the trial court to allow Bethany "to file a motion requesting the relief it considers appropriate as to the issues discussed in the motion to remand." *Id.* The remand order further provided that "[t]he trial court may enter any order it determines appropriate on remand with regard to setting aside or amending the order appealed from." *Id.* This Court subsequently granted respondent's motions for immediate consideration and to amend his appellate brief. *In re REV Minor*, unpublished order of the Court of Appeals, entered June 1, 2022 (Docket No. 360817).

On May 27, 2022, Bethany, consistent with this Court's remand order, moved for a full evidentiary hearing on the petition to identify REV's father and to determine or terminate his

parental rights.[4] Bethany additionally requested findings by the trial court in compliance with the MAC after completion of the proofs. Bethany further asked the court to order the county sheriff to provide respondent with the notice of hearing and to transport him to the hearing. After the first scheduled date for a hearing was adjourned, the hearing was set for June 24, 2022. Respondent, who was still in jail, was personally served with Bethany's motion, the adjournment order, and a notice of hearing for purposes of a determination under MCL 710.36 through MCL 710.39. Personal service was reflected in a proof of service. Bethany also served a subpoena on respondent, ordering him to appear at the hearing and to produce documents that primarily focused on respondent's finances and any assistance provided to mother.

A hearing was conducted on June 24, 2022, by way of ZOOM videoconferencing. Respondent, although incarcerated, was present for the hearing by video. The trial court confirmed personal service on respondent of the various documents referenced above in the proof of service. Respondent, who was not represented by counsel, testified under oath upon examination by the trial court and counsel for Bethany. Respondent indicated that he wanted custody of REV.[5] He conceded that he did not have an established custodial relationship with REV, but it was because he "was not given a chance." Respondent testified that he had resided with mother and others in a rental home for the first two to four months of mother's pregnancy before "she disappeared on [him]." Respondent admitted that he knew that mother was pregnant, and he claimed that he provided her with financial support to cover rent, food, and anything else needed to survive.[6] Except for mentioning the cost of rent, respondent did not give the court any particular dollar amounts, nor did he have any direct documentary proof that he had financially assisted mother. He testified that before being jailed, he earned about $500 per week doing odd jobs, including working on and off for roofing companies. Respondent, who acknowledged receiving Bethany's subpoena, did not produce any paystubs. Respondent revealed that he had not filed any income tax returns from 2018 forward and that he had no real property, bank accounts, motor vehicles, credit cards, or assets of any value.

Respondent testified that mother disappeared on him in October 2021, while also stating that he had been in jail since October 2021. Respondent claimed that he was awaiting trial in August—just two months away—on a charge of domestic violence, third offense, and he eventually conceded that the charge involved mother as the victim, whom he claimed had drug issues and was lying to police about the domestic violence.[7] The trial court, recently equipped with information regarding the charges against respondent, elicited a concession by respondent

---

[4] Bethany titled its motion as a motion on remand from the Court of Appeals. Bethany also filed a supporting memorandum of law.

[5] Respondent was born in 1988 and had an 11th grade education. He had no other children, and he was never married to mother.

[6] Respondent indicated that he and mother rented space from a friend at a cost of about $200 per week.

[7] Respondent maintained that he had no drug-use issues, that he had undergone alcohol rehabilitation at age 20, and that he still consumed alcohol at times.

that he was facing charges of assault of a pregnant person (two separate counts), assault with a dangerous weapon, felony-firearm, and operating a vehicle while intoxicated.[8] Respondent testified that, if awarded custody, he would temporarily need help with REV until August 2022 when his criminal trial would be held. Respondent, who apparently was operating on the assumption that he would be acquitted in the August criminal trial, asked for an adjournment until his criminal trial, but the court denied the request. Respondent claimed that he could not make the $50,000 bond on the criminal charges and that he had not communicated with a bail bondsman.

Respondent also suggested that his mother could care for REV in the interim or longer if necessary, but he indicated that he had not even spoken to her about the possibility. Respondent's mother worked day shifts at a hospital doing cleaning work. When asked who would take care of REV while respondent's mother was at work, respondent stated that he would have to talk to his mother about daycare for REV. He did not know the cost of daycare.[9] Respondent testified that he could not provide financial support for REV while respondent was incarcerated, but he believed that his mother could supply the necessary financial support.[10] Respondent did not know what he would do if his mother could not care for REV. Respondent's plan was to move into his mother's home after the criminal case was completed.

Respondent testified that he was physically healthy and had no mental-health issues. Respondent reiterated his demand from the earlier hearing that he wanted a paternity test, but he admitted that he had not completed any of the necessary paperwork to obtain such testing. After the trial court and Bethany's counsel were done with their examination of respondent, the court asked respondent whether he wanted to present any testimony on his own, and respondent indicated that he had "[n]othing" to say.

Following respondent's testimony, Angela DeLaRosa, who was employed by Bethany, took the stand. DeLaRosa testified that REV was currently in pre-adoptive placement with a family that had passed all background checks during six months of vetting. She opined and stated that the placement constituted an extremely appropriate home environment, that REV was receiving love and affection by the pre-adoptive family, that REV was healthy and her immunizations were fully up to date, that the prospective parents were gainfully employed and financially stable, and that they were both involved in the military. DeLaRosa further commented that the pre-adoptive family had resided in a house for seven years, that they already had one adopted daughter, age three, that they had no physical or mental-health issues, and that there was no domestic violence in the home.

---

[8] Despite respondent's hesitation to speak of his criminal history, it was finally divulged that he was convicted of larceny and breaking and entering a vehicle in 2007, domestic violence in 2009 and 2016, assault and battery and resisting and obstructing an officer in 2017, and maintaining a drug house in 2020.

[9] Respondent did contend that he was aware of the needs of a young child, including food, clothing, a crib, and medical care.

[10] Respondent testified that his 33-year-old brother lived with their mother.

The trial court asked respondent if he had any questions for DeLaRosa and whether respondent still desired custody. Respondent replied, "I don't know, your Honor. It sounds like she's in with a good home, I guess." After the court pushed respondent to make a decision on the matter, respondent decided, once again, that he wanted custody of REV. The proofs were now completed, and counsel for Bethany gave a closing argument in support of the termination of respondent's parental rights and REV's adoption. Respondent declined to make a closing argument.

The trial court issued its ruling from the bench. The court first found that there was no established custodial relationship between respondent and REV and that it was irrelevant under the statute that the lack of a relationship may not have been caused by any fault of respondent. The court next determined that respondent had never provided any support for the child, nor had he provided support to mother after REV's birth. With respect to the two-to-four months of financial support that respondent claimed he had provided mother while they still lived together, the court found that respondent's vague testimony on the matter did not establish that it was regular or substantial support. The court reasoned that even if the support encompassed all of mother's expenses during the timeframe claimed by respondent, it did not come close to covering the full nine-month duration of the pregnancy. Next, the trial court concluded that respondent, ultimately, requested custody of REV, that respondent was unable to care for the child, and that respondent's testimony about his mother's ability to care for and support REV was not persuasive in the least. The trial court noted that it was not even permitted under the caselaw to contemplate whether respondent's mother could provide substitute care for REV. The court determined that respondent had no ability on his own to provide for the child.

The trial court opined that respondent had been very evasive about his criminal history. The court next recounted respondent's testimony about not filing tax returns, about having no assets, and about lacking transportation. The trial court observed that REV needed permanency and that the court was not going to wait until respondent's criminal trial in August before deciding the case. The court proceeded to examine and weigh the best-interest factors found in MCL 710.22(g), comparing respondent to the prospective adoptive parents. We shall quote each of the factors followed by the trial court's ruling on the particular factor. The definitional introduction to MCL 710.22(g) provides that the " '[b]est interests of the adoptee' or 'best interests of the child' means the sum total of the . . . factors to be considered, evaluated, and determined by the court to be applied to give the adoptee permanence at the earliest possible date[.]"

> The love, affection, and other emotional ties existing between the adopting individual or individuals and the adoptee or, *in the case of a hearing under section 39 of this chapter, the putative father and the adoptee*. [MCL 710.22(g)(*i*) (emphasis added).]

The trial court found that there were no such ties between respondent and REV, but that they did exist between REV and the prospective adoptive parents.

> The capacity and disposition of the adopting individual or individuals or, in the case of a hearing under section 39 of this chapter, the putative father to give the adoptee love, affection, and guidance, and to educate and create a milieu that fosters the religion, racial identity, and culture of the adoptee. [MCL 710.22(g)(*ii*).]

The trial court noted that it did not presume that respondent lacked the capacity to give REV love, affection, and guidance, but the court questioned whether he could do so given respondent's criminal history. The court indicated that there was no evidence regarding religion and creed.

> The capacity and disposition of the adopting individual or individuals or, in the case of a hearing under section 39 of this chapter, the putative father, to provide the adoptee with food, clothing, education, permanence, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs. [MCL 710.22(g)(*iii*).]

The trial court found that respondent, on the basis of his own testimony, had "no ability" to provide REV with food, clothing, medical care, or other remedial care, other than possibly through his mother, but her capacity and disposition was irrelevant under this factor. The court further determined that the prospective adoptive family did have the capacity and disposition to provide REV with the types of care enumerated in the statute.

> The length of time the adoptee has lived in a stable, satisfactory environment, and the desirability of maintaining continuity. [MCL 710.22(g)(*iv*).]

The trial court discussed the concepts in this provision, noting that the child had lived with the prospective adoptive parents for a long time, but the court observed that it would not terminate respondent's parental rights on this factor alone.

> The permanence as a family unit of the proposed adoptive home, or, in the case of a hearing under section 39 of this chapter, the home of the putative father. [MCL 710.22(g)(*v*).]

The trial court found that there was a strong family unit with respect to the prospective adoptive family and that respondent did not "have a permanent family unit or custodial home."

> The moral fitness of the adopting individual or individuals or, in the case of a hearing under section 39 of this chapter, of the putative father. [MCL 710.22(g)(*vi*).]

The trial court simply indicated that it was taking into consideration respondent's criminal record, although it would not consider the pending criminal charges.

> The mental and physical health of the adopting individual or individuals or, in the case of a hearing under section 39 of this chapter, of the putative father, and of the adoptee. [MCL 710.22(g)(*vii*).]

The trial court stated that it found this "factor equal."

> The home, school, and community record of the adoptee. [MCL 710.22(g)(*viii*).]

The trial court found that REV was "too young to have established a school or community record, but the home record of the child is fine based on the testimony of Ms. DeLaRosa . . . [that] the custodial home has a good record".

The reasonable preference of the adoptee, if the adoptee is 14 years of age or less and if the court considers the adoptee to be of sufficient age to express a preference. [MCL 710.22(g)(*ix*).]

The trial court found that REV was much too young to express a preference.

The ability and willingness of the adopting individual or individuals to adopt the adoptee's siblings. [MCL 710.22(g)(*x*).]

The trial court found this factor to be irrelevant to the instant proceedings.

Any other factor considered by the court to be relevant to a particular adoption proceeding, or to a putative father's request for child custody. [MCL 710.22(g)(*xi*).]

Under this factor, the trial court decided to take into consideration domestic violence. The court first observed that "[t]he current home has no history of domestic violence or criminal convictions for the same." The trial court then noted that respondent had two prior domestic violence convictions.

The trial court ended its discussion of the best-interest factors by reaching the following conclusion:

I find it clearly and convincingly in the best . . . interest of the child that I terminate [respondent's] parental rights. . . . [E]very single factor that the [c]ourt considered save one lead to the current home environment being preferable. . . . So, clear[] and convincing evidence [exists] that it's in the best interest of the . . . minor child – to terminate [respondent's] parental rights.

As the trial court was reading respondent his appellate rights, Bethany's attorney correctly pointed out to the court that it was not permitted to compare respondent to the prospective adoptive parents when analyzing the best-interest factors.[11] The trial court seemingly agreed, stating, "So,

---

[11] In *In re Dawson*, 232 Mich App 690, 698-699; 591 NW2d 433 (1998), this Court explained as follows:

Nothing in the language of § 39 or subsection 22(f) indicates that the putative father is to be compared to the prospective adopting individual or individuals when evaluating the best interests of the child under § 39. If the Legislature had intended such a comparison it could have easily stated that the putative father is to be compared with the prospective adoptive parents. We also note that the interpretation urged by petitioner cannot be applied in cases where adoptive parents have not yet been found.

Moreover, to require a comparison between the putative father and the prospective adoptive parents would be unfair and unreasonable. Where a putative

I will retract my previous comments with regard to the pre-adoptive home and will simply note that the comments that I made regarding father earlier when considering the best interest factors still hold". The court then rapidly repeated its previous findings on the factors, but only in regard to their application to respondent. Finally, the trial court adamantly concluded that it would not be in the best interests of REV to grant custody to respondent.

An order terminating respondent's parental rights without release or consent was entered on the day of the hearing, June 24, 2022. The form order indicated that the trial court found that respondent was REV's father, that respondent had been given proper notice of the hearing on the petition, that respondent had requested custody of the child, and that

> [t]he father has not established any custodial relationship with the child or did not provide any support or care for the mother during pregnancy or for either the mother or child after the child's birth. The court inquired into the fitness and the ability of the father to properly care for the child. It would not be in the best interest of the child to grant custody to the father.

Respondent now appeals.

## III. ANALYSIS

As referenced earlier, respondent filed an original brief on appeal and an amended brief on appeal. The evidentiary hearing on remand then took place, followed by entry of the "new" termination order. Under the circumstances, respondent's original and amended brief, which focused on the pre-remand proceedings, are moot or irrelevant at this stage. The remand order by this Court directed that respondent "may file a supplemental brief addressing the issues raised on remand within 21 days after the date of entry of the trial court's order deciding the matter or the date the transcript is filed, whichever is later." *In re REV Minor*, unpub order. The trial court's termination order was entered on June 24, 2022. The transcript of the post-remand evidentiary hearing was filed on July 11, 2022. On August 9, 2022, respondent attempted to file a supplemental brief in this Court. Our clerk's office, properly so, rejected the filing because it was untimely. Respondent has not filed a motion in this Court seeking permission to file a late

---

father appears in court desiring custody of his child and is found to be fit and able to properly care for his child, he should not be required to compete with individuals who wish to adopt his child. Specifically, in the instant case, where it was petitioner's conduct that kept respondent from his child, we do not believe that respondent should have to compete with the prospective adoptive parents. Accordingly, we conclude that if the court determines that the father is fit and able to raise his child, the court should then determine, by considering the father's situation alone, whether the best interests of the child are satisfied by placing the child with the father or by terminating the father's parental rights and placing the child for adoption.

supplemental brief. We now sua sponte accept respondent's supplemental brief and will substantively address his arguments raised on appeal.

## A. SERVICE AND NOTICE

In his earlier briefs on appeal, respondent had challenged the sufficiency of the service of the notice of hearing and the petition to identify REV's father and determine or terminate his parental rights. As asserted by respondent and recognized by Bethany, service of the notice of hearing by ordinary mail was defective. See MCR 3.802(A)(2); MCR 2.105(A)(2); MCR 2.107(C)(1) and (2). And there was no indication that the petition itself was served on respondent by any means relative to the January 5, 2022 hearing.

In his supplemental brief, respondent argues that while he was served a number of documents on remand preceding the evidentiary hearing, including the order of adjournment and notice of hearing, there still was no proof that he had ever been served the original petition. We find that this claim is simply inaccurate. There is a proof of service in the record dated January 7, 2022, indicating that respondent was personally served with the petition, even though this was after the court had already decided to terminate respondent's parental rights on January 5, 2022. He was not served with the petition a second time following remand. MCR 2.613(A) provides:

> An error in the admission or the exclusion of evidence, an error in a ruling or order, or an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice.[12]

Aside from the *actual personal service* of the petition on respondent in January 2022, the petition was referenced in respondent's own three appellate briefs and in the various appellate motions. Additionally, Bethany's motion on remand and accompanying memorandum of law, which indisputably were served on petitioner, addressed the petition and the nature of the proceedings. Also, the post-remand notice of hearing alluded to proceedings under MCL 710.36 through MCL 769.39, which pertain to the termination of a putative father's parental rights when the mother of a child born out of wedlock has released her parental rights and consented to an adoption. Clearly, by the time of the evidentiary hearing on remand, respondent knew fully well that the petition and the hearing concerned his identification as REV's father and the determination and termination of his parental rights. Substantial justice does not demand that we order a new hearing on the petition due to lack of proper service, assuming that service was even deficient in the first place. Accordingly, we conclude that respondent's notice-and-service argument does not warrant reversal.

---

[12] "Except as modified by the rules in this chapter, adoption proceedings are governed by [the] Michigan Court Rules." MCR 3.800(A).

## B. EVIDENCE REGARDING MCL 710.39(1) and (2)

Reading subsection (1) in conjunction with subsection (2) of MCL 710.39, it makes the most sense for us to start our analysis with subsection (2), which precludes the termination of a putative father's parental rights if the father had established a custodial relationship with the child or if the father had provided substantial and regular support or care—consistent with the father's ability to provide support or care—for the mother during her pregnancy or for either the mother or the child after birth. If MCL 710.39(2) does not prohibit termination of the father's parental rights, subsection (1) mandates the court to inquire into the father's fitness and his ability to properly care for the child and to determine whether the child's best interests would be served by granting the father custody. Our Supreme Court noted that "[t]here will be many cases in which the putative father meets the conditions that bring him within [the protection of] subsection 2, but in which someone else could make a persuasive showing that the best interests of the child require denying the father custody[;] [n]evertheless, under the statute, the best interests standard of subsection would not apply." *In re Clausen*, 442 Mich 648, 677-678; 502 NW2d 649 (1993).

Before examining respondent's arguments under MCL 710.39(1) and (2), we shall set forth the standards of review and principles of statutory interpretation. An important point that appears to have been overlooked by the trial court and Bethany is that a petitioner in an action under the Adoption Code must prove by clear and convincing evidence that the termination of parental rights is warranted, so as to protect a parent's fundamental liberty interest in the custody of his or her child under the Fifth and Fourteenth Amendments. *In re Colon*, 144 Mich App 805, 813; 377 NW2d 321 (1985); see also *In re ALZ*, 247 Mich App 264, 289; 636 NW2d 284 (2001); *In re Newton*, 238 Mich App 486, 494; 606 NW2d 34 (1999); *In re Hill*, 221 Mich App 683, 691; 562 NW2d 254 (1997); *In re Simon*, 171 Mich App 443, 448; 431 NW2d 71 (1988).[13] The petitioner in this case was mother, but she never testified in relation to respondent's conduct and actions during and after the pregnancy. Bethany effectively took control of the effort to terminate respondent's parental rights.[14]

We review de novo issues concerning statutory interpretation because they are legal in nature. *In re AGD*, 327 Mich App 332, 338; 933 NW2d 751 (2019). "A trial court's factual findings during a proceeding to terminate parental rights under the Adoption Code are reviewed for clear error." *Id.* (citation omitted). This includes a trial court's findings with respect to a child's best interests under MCL 710.39(1) and MCL 710.22(g). *In re BKD*, 246 Mich App 212, 215; 631 NW2d 353 (2001). A trial court's finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court is left with a definite and firm conviction that a mistake had been made. *In re AGD*, 327 Mich App at 338. "[R]egard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before

---

[13] We do note that all of these cases concerned stepparent adoptions under MCL 710.51(6). But we see no reason why the standard would not equally apply in other Adoption-Code termination cases.

[14] Clear and convincing evidence warranting termination can be demonstrated without the petitioner specifically eliciting the testimony or producing the evidence. And clear and convincing evidence can potentially be established solely through a respondent's testimony.

it." MCR 2.613(C). "This Court recognizes that the trial court, while not infallible, is in a better position to weigh evidence and evaluate a witness' credibility." *In re BKD*, 246 Mich App at 220.

Our role in construing statutory language is to ascertain the intent of the Legislature, which may reasonably be inferred from the words used in a statute. *Murphy v Inman*, ___ Mich ___, ___; ___ NW2d ___ (2022) (Docket No. 161454); slip op at 7. The analysis must focus on the express language in the statute because it offers the most reliable evidence of legislative intent. "When the statutory language is clear and unambiguous, judicial construction is limited to enforcement of the statute as written." This Court must consider the plain meaning of the critical words or phrases as well their placement and purpose in the statutory scheme. *Rott v Rott*, 508 Mich 274, 293; 972 NW2d 789 (2021). Each word and phrase in a statute "must be assigned such meanings as are in harmony with the whole of the statute, construed in light of history and common sense." *Honigman Miller Schwartz & Cohn LLP v Detroit*, 505 Mich 284, 295; 952 NW2d 358 (2020) (quotation marks and citation omitted).

With respect to MCL 710.39(2), there is no dispute that respondent did not have an established custodial relationship with REV. And respondent presents no appellate argument on the subject. The question under MCL 710.39(2) then becomes whether respondent had provided substantial and regular support or care, in accordance with his ability to do so, for mother during her pregnancy or for either mother or REV after birth. Respondent argues that the testimony indisputably established that he supplied regular and substantial support to the mother for up to four months during the pregnancy and that the support only ended because mother disappeared, making it impossible for respondent to continue providing financial assistance. Respondent contends that the trial court failed to take into consideration his inability to provide support when mother's whereabouts were unknown and when he was in jail.

Viewed properly, there needed to be clear and convincing evidence that respondent, although having the ability to do so, failed to provide substantial and regular support or care for mother during her pregnancy and for either mother or REV after the child's birth during the 90 days before the notice of hearing was served upon respondent. As noted earlier, respondent testified that he had resided with mother and others in a rental home for the first two to four months of mother's pregnancy before "she disappeared on [him]." Respondent admitted that he knew that mother was pregnant, and he claimed that he provided her with financial support to cover rent, food, and anything else needed to survive. Respondent did not give the court any particular dollar amounts except as to rent, nor did he have any direct documentary proof that he had financially assisted mother. Given that REV was born on December 4, 2021, mother likely became pregnant in early March 2021, meaning that respondent provided support and care for her into July 2021 at the latest if he was testifying truthfully; there was no evidence to the contrary. But respondent also testified that mother did not go missing until October 2021, which appears to be when respondent was jailed for allegedly assaulting mother, thereby creating a gap between when

respondent assertedly last paid for mother's needs to survive and when mother supposedly disappeared.[15]

Respondent's testimony, however, also suggested that he financially supported mother up until she purportedly disappeared, and he was ultimately uncertain with respect to how long he provided financial support. The following colloquy took place at the post-remand evidentiary hearing:

> *The court.* Okay. And sir, did you provide any form of monetary support or income support or any form of support in any way to the child's mother when she was pregnant?
>
> *Respondent.* I mean, temporarily until she disappeared on me.

We have no testimony from mother regarding support or care that respondent may or may not have provided her. Respondent indicated that he was earning $500 per week before he was jailed, which income flow ended upon and during incarceration. He also testified that he had no assets whatsoever, supporting a conclusion that he was unable to provide support or care.

The trial court determined that respondent had never provided any support for the child, nor had he provided support to mother after REV's birth. With respect to the two-to-four months of financial support that respondent claimed he had provided mother while they still lived together, the court found that respondent's vague testimony on the matter did not establish that it constituted regular or substantial support. The court reasoned that even if the support encompassed all of mother's expenses during the timeframe claimed by respondent, it did not come close to covering the full nine-month duration of the pregnancy. There are two flaws in the trial court's ruling. First, the court clearly demanded that respondent prove that his parental rights were protected by MCL 710.39(2); instead of requiring clear and convincing evidence that respondent's parental rights were not shielded by MCL 710.39(2). Second, the trial court did not speak to the issue regarding respondent's ability to provide support or care, which must be considered under MCL 710.39(2). Without that determination, the analysis under MCL 710.39(2) is incomplete. We conclude that respondent's testimony alone, especially absent elaboration on mother's disappearance, did not constitute clear and convincing evidence that respondent, although having the ability to do so, failed to provide substantial and regular support or care for mother during her pregnancy and for either mother or REV after the child's birth. And it was clear error for the trial court to effectively find to the contrary.

Having now provided the correct framework for analyzing MCL 710.39(2), we believe that the proper approach is to reverse the termination order and remand the case to allow a supplemental hearing where additional testimony or evidence can be presented by petitioner, Bethany, or any other interested party, followed by a ruling by the trial court under MCL 710.39(2), as construed in this opinion. Respondent, of course, may also present supplemental evidence. Should no additional testimony or evidence be presented on remand, an order shall be entered dismissing the

---

[15] The record does not indicate whether mother's alleged disappearance had any connection to the charged domestic violence.

petition. We foresee potential issues on remand in connection with respondent's ability to provide support or care, MCL 710.39(2), if it is established that mother's disappearance in fact directly resulted from criminal acts perpetrated by respondent against mother. In other words, and viewed more broadly, if there is an inability to provide care or support because of a respondent father's own wrongdoing or criminal conduct, should the termination of that respondent's parental rights still be barred under MCL 710.39(2). We leave that issue for the trial court to decide in the first instance should the question even arise on remand.

If the trial court determines, under the clear and convincing evidence standard, that upon consideration of the supplemental evidence, termination of respondent's parental rights is not precluded by MCL 710.39(2), the court shall move on to consider MCL 710.39(1) anew in light of the additional evidence. We do reject respondent's argument that the trial court clearly erred in its ruling under MCL 710.39(1), as based on the existing record. Again, MCL 710.39(1) provides:

> If the putative father does not come within the provisions of subsection (2), and if the putative father appears at the hearing and requests custody of the child, the court shall inquire into his fitness and his ability to properly care for the child and shall determine whether the best interests of the child will be served by granting custody to him. If the court finds that it would not be in the best interests of the child to grant custody to the putative father, the court shall terminate his rights to the child.

Under subsection (1), the trial court first found that respondent was not fit to parent REV and was unable to properly care for the child. The court then found, after initially mistakenly comparing respondent to the prospective adoptive parents for purposes of the best-interest factors, that the factors supported a determination that it was not in REV's best interests to award custody to respondent. On appeal, respondent argues that his testimony established that he was fully aware of the needs of a young child, thereby demonstrating his fitness and ability to properly care for REV. Respondent further maintains that the court's findings on the best-interest factors were clearly erroneous. The gist of respondent's argument is that the court improperly inferred from respondent's criminal record that he could not care for a child or lacked the capacity to love and guide REV.

Initially, we do not take into consideration any role that respondent's mother could have potentially played in this case as a temporary caregiver. Respondent had not even spoken to her about the possibility of being involved in REV's care. Furthermore, MCL 710.39(1) and MCL 710.22(g) place the focus on a putative father's fitness and his ability and capacity to care for the child. There is no provision in the Adoption Code allowing for consideration of alternate custody arrangements suggested by a jailed putative father. *In re Ballard*, 219 Mich App 329, 336-337; 556 NW2d 196 (1996) ("Sections 39 and 22 make no provision for considering alternative care and custody arrangements by an incarcerated putative father."); Cf. MCL 712A.19a(8)(a) (provision outside the Adoption Code which provides that termination proceedings need not be initiated when a "child is being cared for by relatives"); MCL 712A.19b(3)(h) (allowing termination of the parental rights of an imprisoned parent who "has not provided for the child's proper care and custody").

In light of respondent's extensive criminal record, which includes convictions for maintaining a drug house and domestic violence, his lack of real property, bank accounts, motor vehicles, or assets of any value, his acknowledgement of a current inability to support REV, and his tenuous future plan to live with and rely on his mother, we cannot conclude that the trial court erred by finding that respondent was unfit, that he lacked the ability to properly care for REV, and that it would not be in the child's best interests to grant custody to respondent. Contrary to respondent's argument, we opine that respondent's criminal record can indeed provide insight into what kind of a parent he would be if awarded custody. And we find unremarkable, underwhelming, and unpersuasive respondent's testimony that he was aware that a young child needs food, clothing, a crib, and medical care. If new evidence is presented in a supplemental hearing, we direct the trial court to revisit MCL 710.39(1) and assess it anew.

## III. CONCLUSION

We reverse the trial court's order terminating respondent's parental rights to REV. We remand the case to the trial court for a supplemental hearing in which petitioner, Bethany, or any other interested party may present new evidence to the court. If no new evidence is proffered and a hearing thus becomes unnecessary, the trial court shall dismiss the petition. If new evidence is presented, respondent may also offer additional evidence, and the trial court shall issue a ruling under MCL 710.39(2), as construed in this opinion. And if the court determines that termination of respondent's parental rights is not precluded under MCL 710.39(2), the court shall proceed to assess and make findings under MCL 710.39(1).

We reverse and remand for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Jane E. Markey
/s/ David H. Sawyer
/s/ Mark T. Boonstra

-18-